Woods *v.* Griffin.

4-6774                                   163 S. W. 2d 322

Opinion delivered June 8, 1942.

L. C. Kirby, Donald S. Martz and Sam M. Wassell, for appellant.

Gordon Armitege and G. P. Houston, for appellee.

SMITH, J.   Appellant Woods brought suit against appellee Griffin to recover a certificate for five shares of the capital stock of the Arkansas National Bank located in Heber Springs. He alleged that by fraud he had been induced to assign this stock to Griffin. Kessinger intervened and alleged that subsequent to the assignment of this stock to Griffin by Woods he had purchased the stock from Griffin and was an innocent holder thereof for value.

The chancellor dismissed the complaint as being without equity, and from that decree is this appeal.

The chancellor prepared a written opinion, in which he reviewed the testimony and gave his reasons for the

conclusion which he reached. He recited in this opinion that the testimony was in irreconcilable conflict; and so it is. The decision of the question raised on this appeal—one of fact—depends entirely on the testimony which is believed.

According to the testimony of Woods, and that of his wife, he was swindled out of the stock. The testimony may be briefly summarized as follows. Woods had been reared in Heber Springs, but enlisted, while living there, as a soldier in the first World War. After the war he re-moved to the state of Oregon, where he married and has since resided for seventeen years, without returning to Heber Springs.

Woods' mother was found dead in her home in Heber Springs on March 31, 1941, and Griffin was the county coroner, and the inquest which he held indicated that Mrs. Woods' death resulted from natural causes.

Everyone knew Mrs. Woods had a son, but no one knew where he was. The sheriff of the county and Griffin began a search through Mrs. Woods' desk to find the son's address. Two safety boxes were found, one of which was locked, the other not. The sheriff was asked if the locked box was opened under Griffin's direction, and he answered, "I don't know whether it was or whether it was at my suggestion." The sheriff testified that "Mr. Griffin carried the two boxes, but I brought the deeds and other stuff to my safe." The question was raised whether the sheriff, or Griffin as coroner, should take possession of the boxes and papers, and it was agreed without controversy that Griffin should have possession.

Woods' address was finally learned, and Griffin advised Woods by telephone that Mrs. Woods was dead. Griffin took charge of the body and had an undertaker prepare it for burial, but he did not buy a casket.

Woods and his wife arrived in Heber Springs April 4th about 4 p. m. They went to a hotel, where they "freshened up," after which they went to Mrs. Woods' home, which they found locked. Woods met a Mr. Dial, whom he had previously known, and he and his wife

went with Dial to Dial's home. While there, Woods received a telephone call from Griffin asking him to come to Griffin's place of business, a drugstore. He went there, accompanied by Dial, and when he and Dial arrived Griffin told Dial he wanted to talk with Woods about personal matters, and Dial left. This statement was not corroborated.

Woods testified that Griffin told him that they had been "war buddies," but that he had never met Griffin before. Griffin proceeded to tell Woods what he had done, and Woods thanked him for his interest and attention and proposed to pay Griffin for his trouble. Griffin said he made no charge, but that the deceased had some stock of doubtful value, which might some day be worth fifteen or twenty dollars, which Woods might assign him if he wanted to pay anything. Woods knew nothing about the stock except what Griffin told him, and, without investigation or inquiry, Woods signed an assignment of the stock to Griffin. This was done by filling out the blank space on the certificate prepared for that purpose. No consideration was paid. Woods admitted that he can read and write. So, it would appear, according to Woods' testimony, that, within a very short time after meeting Griffin he assigned to him the stock certificate without knowing what it was or, as explained by him, "I just knew it was stock."

Griffin told Woods that an administrator would be needed, and volunteered his services as such. On the following day they went to the office of an attorney, who advised that an administrator should be appointed, and Woods testified that "I signed the papers for Griffin to be appointed," and Griffin was appointed.

The testimony establishes very clearly that Woods was dominated by his wife. According to the testimony by both Woods and his wife, she attended to all the business of her husband, yet Woods appears to have had at least one other business transaction without his wife's consent, this being the sale of some timber for $36 which Mrs. Woods testified was worth $250.

Mrs. Woods did not like the idea of having an administration, and she employed an attorney to have the appointment canceled. A session of the probate court was held on the morning of the 10th, being presided over by the chancellor, who rendered the decree from which is this appeal. Woods and Griffin appeared before the chancellor sitting in probate, and the chancellor, in his opinion, states that "I do know that the administration was set aside without objection on Mr. Griffin's part." Just here arise the questions of fact which are pivotal.

Woods testified that he and the attorney he had employed went to Griffin for the papers belonging to the deceased, and that inquiry was made about the bank stock, and Griffin said that he had not seen any. There is no corroboration of this testimony except that of Woods' wife. On the contrary, the testimony of Woods as to the conversation which he had with Griffin immediately following Griffin's discharge as administrator appears very equivocal and is to the following effect: "Q. You was there on the 10th? A. Yes, sir. Q. And I believe he mentioned to you about the stock on that day? A. Yes, sir. Q. And you didn't answer him back? A. I didn't when he called me out. Q. Why didn't you answer him? A. When my wife came out there he was asking what I was going to do about it. Q. You didn't let her hear anything about it? A. No, sir, but I wouldn't have cared. Q. Why didn't you answer him then? A. I come back because the business transaction was there in the office. Q. If you had transferred it on the 4th day of April, 1941, why was it necessary to mention the stock at that time? A. I don't know why he called me out. Q. Didn't you go back the second time to W. R. Griffin's store? A. Not that I remember of, no, sir. Q. How did it happen to be signed the 10th and dated the 10th if it was done the 4th? A. That certificate was signed when I went there the first time. Q. If it was on the 4th, why was it dated on the 10th? A. I don't know."

Now, Woods testified that within a few minutes after meeting Griffin he assigned to Griffin, without

money consideration, stock of a value unknown to him. The par value of the stock was $100 per share; its book value was greater. The cashier of the bank testified that its book value was $815, but that the stock was worth more than that. Griffin testified that he did not know its value, but that he knew it was worth what Woods asked and what he paid.

Now, Griffin categorically denies the testimony of Woods as to the assignment of the stock on the 4th. He denied telling Woods they had been buddies during the war. He stated that he first met Woods in 1920, after the war. He admitted calling Woods at Dial's home, but he stated that he did this at the request of the undertaker, who wished to consult Woods about the selection of a casket. Griffin testified that the stock was purchased and assigned on the 10th. He further testified that Woods proposed to sell the stock, but stated that he did not want his wife to know anything about it; that he had a "plaster" on his car at home, about which his wife knew nothing, and he wanted to discharge the mortgage without letting her know he had given it.

Now, if Woods' version of the transaction is to be accepted as true, he assigned the stock on the 4th, but he did not tell his wife that he had done so, although according to her own testimony, she was following the matter with close interest and attention.

It is an undisputed fact that the assignment is dated, not April 4th, but April 10th, and no satisfactory explanation is made why the assignment should have been dated the 4th if it did not occur until the 10th.

There is a witness in the case to whose testimony the chancellor, as indicated by his opinion, gave much weight; and so do we. This witness was a young man named Charles Shook, who, on April 10th, was employed by Griffin in his drugstore, but who, at the time of the trial, was otherwise employed. The testimony of this witness appears to be candid and disinterested. He testified that he saw Woods sign the assignment, and that he was called to witness Woods' signature. The certificate was lying open, and not folded, on the desk, and that

Woods could have read it had he wished. Woods testified that the certificate was folded when he signed it. Witness Shook did not know what negotiations had preceded. He saw Griffin pay Woods money, in bills, but did not know in what amount.

Now, Woods and his wife were interested witnesses; and so was Griffin; but Shook does not appear to have been. His testimony is either true or false. If true, that of Woods that he assigned the stock on April 4th, without a cash consideration, is false. The chancellor believed Shook, and we are unable to say that he should not have done so, nor that this finding is contrary to the preponderance of the evidence.

The stock, if sold, was sold for less than half its par value, and for less than one-fourth of its book value. But Griffin testified that he did not know its value, but he knew it was worth what he paid.

The chancellor found that no relation of trust and confidence existed between Woods and Griffin. The administrator was discharged on the morning of the 10th, and, according to Griffin and Shook, the stock was purchased that afternoon, and the date of the assignment is corroborative of this testimony. Griffin testified that in offering only $200 for the stock he took into account the services he had rendered and the commissions as administrator which he relinquished, and that he considered he was paying $350 for the stock, although only $200 of it was in cash.

We have the impression and are of the opinion that Woods was not treated fairly; but we are unable to find that he was defrauded. Like the chancellor, we think there was no relation of trust and confidence, and we do not find that false or fraudulent representations were made to Woods which induced him to sacrifice his stock for much less than its value.

We think the testimony supports the finding that Woods was trying to sell this stock without his wife knowing that he had done so, to "hold out" from her the proceeds of the sale to pay the mortgage on his car, as he explained to Griffin, or for some other purpose.

· We find but little, if any, testimony to support the contention that the intervener, Kessinger, a former sheriff of the county, was not an innocent purchaser. But this question need not be considered if the finding of the chancellor that Griffin practiced no fraud is affirmed, and as we are unable to say that the finding of the chancellor is contrary to the preponderance of the evidence the decree will be affirmed.

The sale of the stock at the price received for it was not only improvident, but was foolish; but it may not be avoided on that account. At § 7 of the chapter on Fraud and Deceit, subtitle "Unconscionable Advantage," 12 R. C. L., p. 237, it is said: "So the character and subject of the bargain, as being such as no sane person would make, and no honest man would accept, may also furnish strong evidence of fraud. . . . But not all foolish transactions are fraudulent, and it is neither the duty nor within the power of the courts to relieve a person from a contract merely because it is in its terms unwise or even foolish."

A headnote to the case of *Mason* v. *Graves,* 167 Ark. 678, 265 S. W. 667, reads as follows: "A sane person is bound by a contract fairly entered into, however improvident it may be."

With reluctance and regret, the decree must be affirmed, and it is so ordered.

HUMPHREYS and McHANEY, JJ., dissent.